1  DANIEL W. MAGUIRE, State Bar No. 120002
   E-mail: dmaguire@bwslaw.com
2  KEIKO J. KOJIMA, State Bar No. 206595
   E-mail: kkojima@bwslaw.com
3  BURKE, WILLIAMS & SORENSEN, LLP
   444 South Flower Street
4  Suite 2400
   Los Angeles, California 90071-2953
5  (213) 236-0600; Fax (213) 236-2700

E-filing

6  Attorneys for Plaintiff The Guardian Insurance and Annuity Company, Inc.

7

8                UNITED STATES DISTRICT COURT

9  NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

10

11 THE GUARDIAN INSURANCE          Case No. C 07 3557
   AND ANNUITY COMPANY,
12 INC., a corporation,            COMPLAINT IN INTERPLEADER
                                   AND FOR DECLARATORTY
13              Plaintiff,         JUDGMENT

14    vs.                         [FRCP 22; 28 U.S.C. § 1335]

15 CARLA M. UNTERMANN, an
   individual; PHILLIP
16 UNTERMANN, an individual;
   BRENDA CAMILLI, an individual;
17 JOANNE L. GRIGGS, an
   individual; LISA CAMILLI, an
18 individual; KATHLEEN BUTLER
   CAMILLI, an individual;
19 RICHARD L. CAMILLI, an
   individual; DOLPH F. CAMILLI,
20 an individual; DIANNE R.
   ABRAHAM, an individual;
21 DOUGLAS J. CAMILLI, an
   individual; BRUCE P. CAMILLI,
22 an individual; SPCA OF SAN
   MATEO, CALIFORNIA, business
23 entity, form unknown; DIANNE R.
   ABRAHAM, as Successor Trustee
24 of the Dolph L. Camilli Bypass
   Trust; WILLIAM H. SHEA, JR., as
25 Successor Trustee of the Gerda M.
   Camilli Survivor Trust; and DOES 1
26 through 10, inclusive,

27              Defendants.

28

LA #4828-3482-1377 v1                    1                    Case No.
                                                             COMPLAINT IN INTERPLEADER

1    Plaintiff The Guardian Insurance and Annuity Company, Inc. ("Guardian")

2    alleges as follows:

3

4    ### JURISDICTIONAL ALLEGATIONS

5

6    1.    Subject matter jurisdiction is conferred upon this Court by diversity of

7    citizenship, 28 U.S.C. § 1332, and under the Federal Interpleader Act, 28 U.S.C. §

8    1335.

9

10    2.    Plaintiff Guardian is a corporation organized under the laws of the

11    State of New York, and maintains its principal place of business in the State of

12    New York.  Guardian is authorized to do business and is lawfully doing business as

13    an insurer within the State of California and within this district.

14

15    3.    Defendant Carla M. Untermann is an individual, and a citizen and

16    resident of Hamburg, Germany.

17

18    4.    Defendant Phillip Untermann is an individual, and a citizen and

19    resident of Pfungen, Switzerland.

20

21    5.    Defendant Chris Camilli is an individual, and a citizen and resident of

22    the State of Oregon.

23

24    6.    Defendant Brenda Camilli is an individual.  Guardian is informed and

25    believes she is a citizen and resident of the State of Oregon.

26    ///

27    ////

28    ////

7.      Defendant Joanne L. Griggs is an individual, and a citizen and resident of the State of Florida.

8.      Defendant Lisa Camilli is an individual, and a citizen and resident of Santa Rosa, California.

9.      Defendant Kathleen Butler Camilli is an individual, and a citizen and resident of Santa Cruz, California.

10.     Defendant Richard L. Camilli is an individual, and a citizen and resident of Carmichael, California.

11.     Defendant Dolph F. Camilli is an individual, and a citizen and resident of Santa Cruz, California.

12.     Defendant Dianne R. Abraham is an individual, and is Successor Trustee of the Dolph L. Camilli Bypass Trust, and a citizen and resident of San Mateo, California.

13.     Defendant Douglas J. Camilli is an individual, and a citizen and resident of the State of Florida.

14.     Defendant Bruce P. Camilli is an individual, and a citizen and resident of the State of Hawaii.

15.     Defendant William H. Shea, Jr., is an individual, and is Successor Trustee of the Gerda M. Camilli Survivor Trust, and a citizen and resident of San Francisco County, California.

1       16.     Defendant SPCA of San Mateo, California is a business organization,

2   form unknown, located in San Mateo, California.

3

4       17.     The identities of defendants Does 1 – 10 are not currently known.

5   Does 1 – 10 are beneficiaries or claimed beneficiaries of the annuity contracts at

6   issue herein.

7

8       18.     Diversity of citizenship between Guardian as stakeholder and the

9   claimants exists for purposes of Rule 22, Federal Rules of Civil Procedure, in that

10  Guardian is incorporated in the State of New York with its principal place of

11  business in the State of New York, and none of the defendants are citizens or

12  residents of New York.

13

14      19.     Minimal diversity exists for purposes of the Federal Interpleader Act,

15  28 U.S.C. § 1335, as defendant Lisa Camilli is a citizen of California, defendant

16  Chris Camilli is a resident of Oregon, defendant Douglas J. Camilli is a citizen of

17  Florida, defendant Bruce P. Camilli is a citizen of Hawaii, defendant Carla M.

18  Untermann is a citizen of Germany, and defendant Phillip Untermann is a citizen

19  of Switzerland.

20

21      20.     More than $75,000 is in controversy in this case, exclusive of interest

22  and costs. As explained below, the value of the subject stake of this interpleader is

23  $665,285.42 in annuity contracts as of June 14, 2007, for which a death benefit

24  became due and payable by reason of the death of Gerda M. Camilli.

25  ///

26  ///

27  ///

28  ///

## FACTS RELEVANT TO THE STAKE INTERPLED

### The 1997 Annuity Contract

21.    On and effective November 6, 1997, Guardian issued its Individual Deferred Variable Annuity Contract No. 201176527 ("1997 contract") to Gerda Molly Camilli, as owner and annuitant.  In accordance with the provisions of the contract, Gerda Molly Camilli named Carla M. Untermann as primary beneficiary, and Phillip Untermann as contingent beneficiary.  A true and correct copy of the 1997 contract is attached hereto as Exhibit "1."

22.    In November 2002, Gerda Molly Camilli provided to Guardian a written change of beneficiary request in which she designated the following beneficiaries of the 1997 contract:

"•    SPCA of San Mateo – $26,482.20, approximately 6.2%;

•    $400,000 to be used according to the following percentages:

    •    Carla M. Untermann, sister, Blumenau 22, D22089 Hamburg, Germany, 25%;

    •    Philipp Untermann, nephew, Margret Str. 2a, CH-8304 Wallisellen, Switzerland, 37.5%.  Should Carla M. Untermann be deceased then Philipp Untermann is the sole heir of her 25% share;

///
///

1     •  Chris and Brenda Camilli, Chris grandson of deceased Dolph

2       Camilli, 25%, 312 Short Street, Missoula, MT 59804;

3

4     •  Joana Brigs [sic – should be "Griggs"], daughter of deceased

5       Dolph Camilli, 5%, 580 Garden Circle, Winter Park, FL 32792;

6

7     •  Lisa Camilli, daughter of Bruce and Karen Camilli, Bruce son

8       of deceased D. Camilli, 3.75%, c/o Bruce Camilli, 1119

9       Winding Ridgeway, Santa Rosa, CA 95404;

10

11     •  Kathleen Butler, daughter of Dolph Camilli, Jr., 3.75%, c/o

12       Dolph Camilli, Jr., 6224 Pecan Drive, Orangevale, CA 95662."

13

14   Attached as Exhibit "2" is a true and correct copy of this written beneficiary

15 designation change.

16

17 **The 1999 Annuity Contract**

18

19   23. On and effective September 20, 1999, Guardian issued its Individual

20 Flexible Premium Deferred Variable Annuity Contract No. 210197866 ("1999

21 contract") to Gerda M. Camilli as owner and annuitant.  A true and correct copy of

22 the 1999 contract is attached hereto as Exhibit "3."

23

24   24. On November 4, 2002, Gerda M. Camilli completed a notice of

25 beneficiary designation change, submitted in writing to Guardian, designating

26 Phillip Untermann (nephew) as primary beneficiary and Joanne Untermann

27 (grandniece) as secondary beneficiary.  A true and correct copy of this beneficiary

28 designation change is attached hereto as Exhibit "4."

**Death of Annuitant**

25.    On May 1, 2005, Gerda M. Camilli died.

26.    On October 14, 2005, Guardian received notice of Gerda M. Camilli's death from Karen Frisbe of the Law Offices of Martin Paolini, Jr. Ms. Frisbe indicated that she was unaware who the beneficiaries of the annuity contracts were. Guardian identified to Ms. Frisbe the required documentation necessary to process the death claim.

27.    On January 13, 2006, Guardian wrote to Ms. Frisbe, explaining, among other things, that the required paperwork must be received in good order in order to process the death claim under the contracts.

28.    Having heard nothing further from Ms. Frisbe or Mr. Paolini's office, Guardian wrote to Ms. Frisbe again on April 13, 2006 requesting the same information.

29.    No response was received to its April 13, 2006 letter, so Guardian wrote to Ms. Frisbe again on July 14, 2006, requesting submission of the above-referenced information. No response was received.

30.    Pursuant to the terms of the contracts, the contract value of each annuity has remained invested as allocated by Gerda M. Camilli in accordance with her allocation instructions under the contracts.

///
///
///

1      31.    On April 20, 2007, Guardian received a letter from the Law Offices of

2  John G. Clark dated April 4, 2007. A true and correct copy of this letter is attached

3  hereto as Exhibit "5." The letter enclosed an order filed November 17, 2006 in the

4  San Mateo County Superior Court in Case No. 115210, captioned "Order to

5  Confirm That Certain Community Property Assets Are Included in the Trust Estate

6  of the Dolph L. Camilli and Gerda M. Camilli Revocable Living Trust UDT

7  February 11, 1997, as amended and to fund the Gerda M. Camilli Survivor Trust

8  and Dolph L. Camilli Bypass Trust." A true and correct copy of this order is

9  attached hereto as Exhibit "6."

10

11      32.    The April 4, 2007 letter (Exhibit 5) requested Guardian to liquidate

12  both contracts, divide the proceeds and distribute them in equal shares to defendant

13  Dianne R. Abraham, as Successor Trustee of the Dolph L. Camilli Bypass Trust

14  and to defendant William H. Shea, Jr., Successor Trustee of the Gerda M. Camilli

15  Survivor Trust.

16

17      33.    Guardian was not named as a party to the state court action from

18  which the order (Exhibit 6) issued, received no notice of the state court action, no

19  notice of the hearing on which state court order was based, and no notice of any

20  potential adverse claim to the proceeds of the annuity contracts until it received

21  attorney Clark's April 4, 2007 letter on April 20, 2007.

22

23      34.    Both the 1997 contract and the 1999 contract require Guardian to

24  distribute the death benefits under each annuity to the designated beneficiaries of

25  the respective contracts. The 1997 contract contains the following provision:

26  ///

27  ///

28  ///

1    **"Beneficiary**

2

3        The beneficiary is named in the application or in any later change shown in

4    the Company's records.  The Company will pay the death benefit to the

5    beneficiary."

6

7        35.    The 1999 contract contains the following provision:

8

9    **"Death of an Owner**

10

11            If an owner and the annuitant are the same person, and

12            such person dies before the Annuity Commencement

13            Date, then the death benefit becomes payable to the

14            beneficiary . . . ."

15

16        36.    The order (Exhibit 6) purports to require Guardian to void all

17    beneficiary designations, and distribute the death benefit annuity proceeds to the

18    Dolph L. Camilli Bypass Trust and the Gerda M. Camilli Survivor Trust, through

19    their respective trustees:

20

21            "WHEREFORE, under the above stated findings and

22            other good cause shown, IT IS HEREBY ORDERED:

23

24            3.    The designation of any beneficiary by Gerda M.

25                  Camilli, aliases known, to any of the above-

26                  referenced accounts and/or funds and/or annuities

27                  is hereby deemed terminated and revoked and any

28                  such beneficiary is deemed to have no right, title,

1    interest and estate in any such accounts and/or

2    annuities and/or funds held under such account."

3    (Exhibit 6, p. 8)

4

5    ### FIRST CAUSE OF ACTION FOR INTERPLEADER

6

7    37.    Plaintiff incorporates by this reference all allegations set forth in

8    paragraphs 1 – 36 above, as though fully set forth herein.

9

10    38.    By reason of the death of Gerda M. Camilli, death benefits under both

11    the 1997 contract and the 1999 contract became due and payable.  Adverse and

12    conflicting claims exist to the death benefits of the 1997 contract and the 1999

13    contract.

14

15    39.    The 1997 contract requires Guardian to distribute the proceeds to

16    defendants Carla Untermann, Phillip Untermann, Chris Camilli, Brenda Camilli,

17    Joanne Griggs, Lisa Camilli, Bruce Camilli, Kathleen Butler Camilli, and the

18    SPCA of San Mateo, California, in the percentages designated by Gerda Camilli in

19    her November 2002 beneficiary designation change form.

20

21    40.    The 1999 contract requires Guardian to distribute the death benefit

22    proceeds to Phillip Untermann in accordance with the November 4, 2002 Notice of

23    Beneficiary Change by Gerda Camilli.

24

25    41.    The order purports to require Guardian to distribute the death benefit

26    proceeds to the Dolph L. Camilli Bypass Trust and the Gerda M. Camilli Survivor

27    Trust, through their respective Successor Trustees.

28    ///

10

1    42.    Guardian is informed and believes that the beneficiaries of the Gerda
2    M. Camilli Survivor Trust are Carla M. Untermann, Phillip Untermann, and the
3    SPCA of San Mateo, California.

4

5    43.    Guardian is informed and believes that the beneficiaries of the Dolph
6    L. Camilli Bypass Trust are Carla M. Untermann, Richard L. Camilli, Dolph F.
7    Camilli, Dianne R. Abraham, Douglas J. Camilli, Joanne L. Griggs, and Bruce P.
8    Camilli.

9

10    44.    Guardian is further informed and believes that the percent of death
11    benefit distribution to the various beneficiaries under the Survivor Trust and
12    Bypass Trust differ from the percentages assigned in beneficiary designations
13    under the 1997 contract and the 1999 contract.

14

15    45.    For the above reasons, the claims of defendants are adverse and
16    conflicting.  Guardian is unable to decide the validity of any of said claims, and
17    Guardian is unable to decide whom it should pay.

18

19    46.    By reason of the death of Gerda M. Camilli, there is now due and
20    payable under the 1997 contract the total sum of $604,348.79 consisting of the
21    death benefit valued as of June 14, 2007.  Guardian claims no beneficial interest in
22    said sum, except as a mere stakeholder.  By reason of the conflicting claims by
23    defendants, Guardian cannot determine which of the defendants are entitled to
24    payment of the amount due under the 1997 contract, or in what amounts, and
25    cannot pay any part of said sum without danger of being compelled to pay such
26    sum to each of the defendants herein.

27    ///

28    ///

1    47.    By reason of the death of Gerda M. Camilli, there is now due and

2  payable under the 1999 contract the total sum of $60,936.63, consisting of the

3  death benefit valued as of June 14, 2007.  Guardian claims no beneficial interest in

4  said sum, except as a mere stakeholder.  By reason of the conflicting claims by

5  defendants, Guardian cannot determine which of the defendants are entitled to

6  payment of the amount due under the 1999 contract, or in what amounts, and

7  cannot pay any part of said sum without danger of being compelled to pay such

8  sum to each of the defendants herein.

9

10        **SECOND CAUSE OF ACTION FOR DECLARATORY JUDGMENT**

11

12    48.    Plaintiff incorporates by this reference all allegations set forth in

13  paragraphs 1 – 47 above, as though fully set forth herein.

14

15    49.    Under the terms of the 1997 contract, when the owner or annuitant's

16  death occurs on or before the retirement date, a death benefit becomes payable.

17  The retirement date of the 1997 contract is May 1, 2011.

18

19    50.    Under the terms of the 1999 contract, when the owner and annuitant

20  are the same person, a death benefit becomes payable to the beneficiary upon the

21  death of the owner/annuitant, if the death occurs prior to the annuity

22  commencement date.  The annuity commencement date of the 1999 contract is

23  May 1, 2016.

24

25    51.    Under both the 1997 and 1999 contracts, Gerda M. Camilli was owner

26  and annuitant, and died on May 1, 2005, prior to the retirement date of the 1997

27  contract, and prior to the annuity commencement date of the 1999 contract.

28  ///

52.   Under the terms of both the 1997 and 1999 contracts, the death benefit becomes payable to the beneficiary when the claim of the beneficiary is settled.

53.   Because there are adverse and conflicting claims to the proceeds of both the 1997 and 1999 contracts, no claim for the death benefit under either contract can be settled unless and until either (1) all the proper beneficiaries are determined, (2) all beneficiaries and potential beneficiaries stipulate to the settlement of the claim, or (3) the Court orders the contracts liquidated and deposited into the Court's registry pending resolution of the conflicting claims.

54.   Guardian is a disinterested stakeholder.  Guardian should not be required to remain in this litigation pending resolution of the conflicting claims. However, because the value of the contracts fluctuate with the value of the securities they hold, Guardian cannot liquidate the annuities and deposit the proceeds on its own initiative while competing claims exist without being exposed to claims by the eventual beneficiary for improper liquidation.

55.   Guardian therefore requests a declaration and order from the Court to liquidate both the 1997 and 1999 contracts on a date certain, and to deposit the proceeds into the registry of the Court in an interest-bearing blocked account, there to remain until the claims of the adverse claimants are resolved.

56.   Because both contracts are variable annuity contracts,  the value of each contract will continue to fluctuate until the Court orders the liquidation.

///
///
///
///
///

1    WHEREFORE, Plaintiff The Guardian Insurance and Annuity Company,
2    Inc. prays as follows:

3

4    1.    That the defendants and each of them be restrained from instituting
5    any action against Plaintiff Guardian for the recovery of the amount of the 1997
6    contract, the 1999 contract and/or any part thereof;

7

8    2.    That the defendants be required to interplead and settle among
9    themselves their respective rights to the proceeds under the 1997 contract and 1999
10   contract, and that Guardian be discharged from any and all liability to defendants
11   under said contracts or otherwise;

12

13   3.    That the Court issue its order requiring Guardian to liquidate both the
14   1997 and 1999 contracts on a date certain, and to deposit the proceeds into the
15   registry of the Court in an interest-bearing blocked account, there to remain until
16   the claims of the adverse claimants (defendants) are resolved;

17

18   4.    That Guardian be reimbursed for its necessary costs and attorneys'
19   fees in prosecuting this interpleader action under Federal Rule of Civil Procedure
20   22, and under 28 U.S.C. § 1335; and

21   ///
22   ///
23   ///
24   ///
25   ///
26   ///
27   ///
28   ///

1    5.    For such other and further relief as the Court deems proper.

2

3   DATED:  July 6, 2007                     DANIEL W. MAGUIRE
                                             KEIKO J. KOJIMA
4                                            BURKE, WILLIAMS & SORENSEN, LLP

5

6                                            By:_____
7                                               KEIKO J. KOJIMA
                                                Attorneys for The Guardian Insurance
8                                               and Annuity Company, Inc

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LA #4828-3482-1377 v1                    15               Case No.
                                                          COMPLAINT IN INTERPLEADER

| Annuitant Contract Number | GERDA MOLLY CAMILLI 210176527 | | |
|---|---|---|---|

NOVEMBER 06, 1997 — 71 Female    Age and Sex Issue Date



**GUARDIAN**

The Guardian
Insurance & Annuity
Company, Inc.

A Stock Company
Incorporated in the
State of Delaware

Customer Service Office:
P.O. Box 26210
Lehigh Valley, PA 18002-6210

Executive Office
7 Hanover Square
New York, NY 10004

The Guardian Insurance & Annuity Company, Inc. (the Company) will pay the benefits provided by this contract in accordance with its provisions. All of the provisions on this and the following pages are part of this contract. This contract is issued by the Company at its Customer Service Office on the issue date.

**Secretary**

**President**

Checked By

Under this contract, a single premium payment or flexible premium payments may be made prior to the retirement date. On the retirement date, the Company will begin to make monthly annuity payments. Benefits depend, among other things, on the number and value of accumulation units and the annuity payout option elected. Death benefit proceeds are payable on or before the retirement date.

ALL VALUES PROVIDED BY THIS CONTRACT WHICH ARE BASED ON THE INVESTMENT EXPERIENCE OF A SEPARATE ACCOUNT ARE VARIABLE, MAY INCREASE OR DECREASE, AND ARE NOT GUARANTEED.

**Individual Deferred Variable Annuity Contract - Providing for a Single Premium Payment or Flexible Premium Payments**
- Monthly annuity payments begin on the retirement date
- Benefits based on the investment experience of a Separate Account are variable and are not guaranteed
- Premium(s) payable during annuitant's lifetime prior to retirement date
- Non-participating - No dividends payable

IVA-2008

EXHIBIT 1

# GUIDE TO CONTRACT PROVISIONS

1.  Annuity Benefit
2.  Death Benefit
3.  Owner and Beneficiary
4.  Premium Payment(s)
5.  Separate Accounts
6.  Fixed-Rate Option
7.  Transfers
8.  Accumulation Value
9.  Surrenders and Withdrawals
10. Payment of Contract Proceeds
11. General Provisions

Followed by any Endorsements.

An alphabetical index appears on the inside of the back cover.

EXHIBIT 1

## CONTRACT DATA

ANNUITANT:    GERDA MOLLY CAMILLI
CONTRACT NUMBER:    210176527

71 - Female           AGE AND SEX
NOVEMBER 06, 1997      ISSUE DATE

CONTRACT RETIREMENT DATE: MAY    01, 2011

OWNER:    GERDA MOLLY CAMILLI

BENEFICIARY:    THE BENEFICIARY(IES) DESIGNATED IN THE APPLICATION ATTACHED TO THIS CONTRACT, UNLESS SUBSEQUENTLY CHANGED.

MINIMUM BAILOUT RATE: 4.50%

PREMIUM PAYMENT SINGLE PREMIUM PAYMENTS

### PREMIUM SCHEDULE

PAYMENT OF $184,992.33 IS DUE ON THE ISSUE DATE AND IS PAYABLE IN ADVANCE. THIS AMOUNT, LESS ANY DEDUCTIONS FOR STATE PREMIUM TAXES, WILL BE ALLOCATED TO THE VARIABLE INVESTMENT OPTION(S) AND/OR THE FIXED RATE OPTION AS SPECIFIED IN THE APPLICATION.

FOR CHARGES AGAINST THE VARIABLE INVESTMENT OPTION(S), SEE NET INVESTMENT FACTOR PROVISION ON PAGE 9. FOR A DESCRIPTION OF THE ADMINISTRATION FEE, SEE ADMINISTRATION FEE PROVISION ON PAGE 10. FOR CHARGES AGAINST SURRENDERS AND WITHDRAWALS, SEE SURRENDERS AND WITHDRAWALS SECTION ON PAGE 10.

THE GUARDIAN INSURANCE & ANNUITY COMPANY, INC.

IVA-2008

18

EXHIBIT 1

EXHIBIT 1

# 1. ANNUITY BENEFIT

**Annuity Benefit**

The Company will make annuity payments each month starting on the retirement date shown on page 3 if the annuitant is then living and this contract is in force on that date. The retirement date cannot be later than the annuitant's 85th birthday unless the Company agrees in writing to a different date. On the retirement date, the Company will determine the amount of each monthly annuity payment. This amount will be calculated by applying the contract's accumulation value, less any applicable state premium taxes, under Option V-2 of Variable Annuity Payout Options, unless another option is elected. The amounts of the payments will vary according to the annuitant's age and sex. Under Option V-2, payments are guaranteed for a period of 10 years. If the annuitant or owner dies before the end of the

guaranteed period, payments will continue to the beneficiary for the rest of that period. See the "Payment of Contract Proceeds" section for an explanation of how annuity payments are determined.

**Change of Retirement Date or Annuity Payout Option**

If the Company consents, the owner may change the retirement date shown on page 3 to a date not later than the annuitant's 85th birthday (unless the Company agrees otherwise). The owner may also change any elected annuity payout option before the retirement date. In order to effect either of these changes, the Company must receive proper written request at its Customer Service Office from the owner at least 60 days prior to the retirement date.

# 2. DEATH BENEFIT

The amount payable to the beneficiary upon receipt by the Company at its Customer Service Office of due proof of the owner's or annuitant's death on or before the retirement date is the greater of:

- the accumulation value of the contract as of the end of the valuation period (as defined in "General Provisions") during which the Company received the due proof of death; or
- the total amount of premium(s) paid, less any partial withdrawals and any contingent deferred sales charges made before death.

If this contract is issued when the annuitant is age 75 or older, then the amount payable will be the accumulation value as of the end of the valuation period during which the Company receives due proof of death.

The death benefit will be paid in one sum unless otherwise elected. If an annuity payout option is in effect for the death benefit at the time of the annuitant's death, the remaining proceeds, less any applicable state premium taxes, will be applied under such option. If no election of an annuity payout option is made upon the annuitant's death, the beneficiary may elect an option, subject to the following conditions:

- Any election must be in a written form satisfactory to the Company.
- Election must be made within one year after the annuitant's death.

When required by state law, the Company will pay interest on the death benefit in accordance with the applicable statute.

# 3. OWNER AND BENEFICIARY

**Owner**

The owner is named in the application or, if a change of owner is permissible, in any later change shown in the Company's records. While the annuitant is living, the owner alone has the right to receive all benefits and exercise all rights this policy grants or the Company allows.

**Joint Owner**

If more than one person is named as owner, they are considered by the Company to be joint owners. Any

contract transaction requires the signatures of all persons named jointly. Unless otherwise provided, if a joint owner dies, ownership passes to the surviving joint owner(s). When the last joint owner dies, ownership passes to that person's estate, unless otherwise provided.

**Beneficiary**

The beneficiary is named in the application or in any later change shown in the Company's records. The Company will pay the death benefit to the beneficiary.

## OWNER AND BENEFICIARY - cont'd

Unless otherwise provided, in order to receive the death benefit at the owner's or annuitant's death, a beneficiary must be living on the earlier of:

- the date proof of the owner's or annuitant's death is received at the Company's Customer Service Office; or
- the 15th day after the owner's or annuitant's death.

Unless otherwise provided, if no designated beneficiary is living on such earlier date, the owner or the owner's estate is the beneficiary.

### Contingent Beneficiary

A numbered sequence may be used to name contingent beneficiaries. The beneficiary is the living person(s) designated by the lowest number in the sequence.

### Concurrent Beneficiary

If more than one person is named with no number or the same number, they are considered by the Company to be concurrent beneficiaries. These persons, or the survivor(s), share equally, unless otherwise provided. If a beneficiary of an unequal share does not survive the annuitant, this share passes to the owner or the owner's estate, unless otherwise provided.

### Change of Owner or Beneficiary

The owner may change the owner or beneficiary of this contract. Any request for change must be in a written form satisfactory to the Company. The change will take effect on the date the request is signed, whether or not the owner or annuitant is living when the Company receives the request at its Customer Service Office. However, the change will not apply to any payments made or actions taken by the Company before the request is received.

### Assignment

No assignment will bind the Company unless the original, or a copy in a form satisfactory to the Company, is filed at the Customer Service Office. Afterward, the rights of any owner or beneficiary will be subject to the assignment. The entire contract will be subject to the assignment. The Company will rely solely on the assignee's statement as to the amount of the assignee's interest. The Company will not be responsible for the validity of any assignment. Unless otherwise provided, the assignee may exercise all rights this contract grants except:

- the right to change the owner or beneficiary; and
- the right to elect an annuity payout option.

## 4. PREMIUM PAYMENT(S)

The owner may make either a single premium payment or flexible premium payments under this contract as shown on page 3. The premium payable on the issue date is also shown on page 3. Any single premium payment and additional flexible premium payments, if any, are payable at the Company's Customer Service Office.

At any time before the retirement date while the annuitant is living, the Company will accept additional premiums for a flexible premium payment contract. The minimum amount of any additional premium payment is $100, unless this contract is purchased by or in connection with an employer-sponsored plan or through employee payroll deductions. In such cases, the minimum amount of any additional premium payment is $50. For a flexible premium payment contract, the maximum amount of total premium payments made in any contract year after the first is the lesser of:

- ten times the total amount of premium payments made in the first contract year; or
- $100,000.

This maximum may be exceeded with written consent from the Company.

### Allocation of Net Premium(s)

A net premium is equal to the premium paid less any applicable state premium taxes. Subject to the conditions described below, the Company will allocate the net premium(s) to the contract's allocation options, which consist of the Fixed Rate Option and the following variable investment options:

- the subdivisions of the investment divisions of Separate Account D (as described below); and
- the Real Estate Account (as described below).

Such allocation will be based on the allocation percentages designated in the application, or as subsequently changed by the owner in a written notice acceptable to the Company and received by the Company at its Customer Service Office prior to the date of the allocation. The value of the contract and any net premium(s) paid may not be invested in more than four allocation options at any time, that is, such value or net premium(s) may not be transferred or allocated to more than four variable investment options or three variable investment options and the Fixed Rate Option at any time.

Net premium(s) will be applied to provide accumulation units (see "Accumulation Units" provision).

**21**

EXHIBIT 1

# 5. SEPARATE ACCOUNTS

**The Guardian Separate Account D and The Guardian Real Estate Account**

This contract is funded by two separate investment accounts established by the Company under the laws of the state of Delaware. These separate accounts are subject to the laws of the jurisdiction in which this contract is delivered. These separate accounts are:

- The Guardian Separate Account D (Account D); and
- The Guardian Real Estate Account (the RE Account).

Account D is registered as a unit investment trust with the Securities and Exchange Commission (SEC) under the Investment Company Act of 1940, and its units are registered under the Securities Act of 1933 (1933 Act). The RE Account itself is not an investment company, but its interests are registered with the SEC under the 1933 Act. Each separate account is treated as a division of the Company. Account D is used to provide values and benefits for variable annuities only. The Company owns the assets in both separate accounts. The assets in Account D and the RE Account are kept separate from:

- each other;
- the Company's general investment account; and
- the Company's other separate accounts.

Assets equal to the reserves and liabilities of Account D or the RE Account will not be charged with liabilities that arise from any other business the Company may conduct. The Company may transfer assets in excess of the reserves and liabilities of Account D or the RE Account to the general investment account. Income and realized and unrealized gains and losses from assets in Account D or the RE Account are credited to or charged against the applicable separate account without regard to income, gain, or loss in the Company's other investment accounts.

**Investment Divisions**

Account D consists of several investment divisions. Each division contains two subdivisions for measuring the investment experience of contract accumulations and annuity payments. One subdivision is for contracts issued under tax qualified plans. The other subdivision is for contracts issued under non-tax qualified plans. Each subdivision will have its own identified values.

Each investment division of Account D invests in shares of a mutual fund. Each mutual fund is managed by an investment adviser registered under the Investment Advisers Act of 1940.

The investment divisions available on the issue date are listed in the then current prospectus for Account D as it relates to this contract. Each mutual fund is more fully described in a separate prospectus for each fund.

**Rights Reserved by the Company**

The Company reserves the right to take certain actions deemed to be in the best interest of the owner and beneficiary and when permitted by applicable law. These actions are:

- to deregister Account D under the Investment Company Act of 1940;
- to operate Account D as a management investment company or any other form permitted by law;
- to combine any two or more separate accounts or investment divisions within Account D;
- to transfer assets determined by the Company to be assigned to the class of contracts to which the contracts belong from Account D or the RE Account to another separate account by withdrawing the same percentage of each investment in Account D or the RE Account, with appropriate adjustments to avoid odd lots and fractions;
- to substitute shares of any fund offered under this contract with shares of another fund offered under this contract if, in the judgment of the Company, further investment in such shares is no longer appropriate. Such change may be subject to the approval of the SEC, the Delaware Insurance Department, and other state or federal regulatory authorities;
- to add to, eliminate, or suspend the owner's ability to allocate premium payments or transfer amounts to any investment division within Account D and/or the Real Estate Account; and
- to modify this contract as necessary to prevent the owner from being considered the owner of the assets of Account D, the RE Account, or the Fixed Rate Option.

**Change in Investment Objective or Policy**

The Company will notify the owner of any material change in an investment policy or objective of any mutual fund invested in by an investment division to which part of this contract's accumulation value is allocated. Details of any such change will be filed with any regulatory authority where required and will be subject to any required approval.

EXHIBIT 1

22

# 6. THE FIXED RATE OPTION

The owner may allocate all or part of any net premium(s) to the Fixed Rate Option. The Company will credit interest on the portion of net premium(s) applied to and any amounts transferred to the Fixed Rate Option. Interest will accrue daily at a minimum guaranteed annual rate of 3.5%. At the discretion of the Company, an interest rate in excess of the minimum guaranteed rate may be credited. The Company will provide notice of the applicable interest rates in the annual report to the owner and upon request.

Any portion of a net premium allocated to the Fixed Rate Option on the issue date will earn interest at the then current rate as set by the Company. This interest rate will be guaranteed until the next contract anniversary.

After the issue date, any portion of net premium(s) applied to and any amounts transferred into the Fixed Rate Option will earn interest at the then current rate set by the Company. This rate will be guaranteed for the remainder of the contract year, until the next contract anniversary.

On the contract anniversary, any portion of the accumulation value attributed to the Fixed Rate Option will earn interest at the then current rate set by the Company. This rate will be guaranteed until the next contract anniversary.

If, on any contract anniversary the interest rate the Company sets for the Fixed Rate Option is more than 3 percentage points lower than the rate set for the immediately preceding contract year, the owner may withdraw all or a portion of the accumulation value held in the Fixed Rate Option for at least one contract year without that amount being subject to a contingent deferred sales charge. The Company must receive proper written request for such withdrawal at its Customer Service Office within 60 days of such contract anniversary.

# 7. TRANSFERS

## Transfers Before the Retirement Date

During the period up to 30 days before the retirement date, the owner may transfer all or a portion of the accumulation units credited under this contract among the investment divisions of Account D, the RE Account, and the Fixed Rate Option, subject to the following conditions:

- Proper written request for transfer must be received by the Company at its Customer Service Office. Other transfer procedures permitted by the Company, if any, must be followed as set out in the prospectus for this contract.
- Accumulation units may not be credited to or transferred into more than four variable investment options or to three variable investment options and the Fixed Rate Option at any time.
- The transfer of accumulation units from the RE Account to a subdivision of Account D or to the Fixed Rate Option may only be made once each year on or within 30 days after a contract anniversary. The maximum amount that may be transferred from the RE Account each contract year is the greater of:
  - 33 1/3% of the accumulation value attributable to the RE Account as of the contract anniversary; or
  - $10,000.
- The transfer of accumulation units from the Fixed Rate Option to a subdivision of Account D or to the RE Account may only be made once each year on

or within 30 days after a contract anniversary. Transfers out of the Fixed Rate Option will be made in the same order as such amounts were allocated to the Fixed Rate Option. The maximum amount that may be transferred from the Fixed Rate Option each contract year is the greater of:

- 33 1/3% of the portion of the accumulation value attributable to the Fixed Rate Option as of the contract anniversary; or
- $2,500.

For transfers made before the retirement date, the number of additional accumulation units credited under this contract in the newly elected Fixed Rate Option or variable investment option(s) will be equal to (a) divided by (b), where:

- (a) is the value of the amount transferred; and
- (b) is the value of an accumulation unit in the newly elected investment option(s) as of the end of the valuation date on which the proper written request for transfer is received by the Company at its Customer Service Office.

The Company reserves the right to limit the frequency of transfers of accumulation units under the contract to once every 30 days and to charge for such transfers in the future.

Page 8 EXHIBIT 1

# TRANSFERS - cont'd

### Transfers After the Retirement Date

After the retirement date, the owner who has elected a variable annuity payout option may transfer all or a portion of the annuity units (as defined in the "Annuity Unit Values" provision) credited under this contract among the variable investment options. The conditions applicable to transfers made before the retirement date also apply to transfers made after that date. However, any transfers after the retirement date can be made only once each year and only as of December 31st of any year. The Company must receive transfer instructions on or before December 1st of that year. No further transfers can be made until the next December 31st.

For transfers made after the retirement date, the number of additional annuity units credited under this contract in the newly elected variable investment option(s) will be equal to (a) divided by (b), where:

- (a) is the amount of the monthly variable annuity payment that is to be transferred as of December 31st of that year; and
- (b) is the value of one annuity unit in the newly elected investment option(s) as of December 31st of that year.

After the retirement date, the owner who has elected a fixed annuity payout option may not transfer into or out of this option.

### Dollar Cost Averaging Transfer Option

If part of the contract's accumulation value is allocated to the investment division investing in the RS Money Market VIP Series, the owner may choose to make monthly transfers under the Dollar Cost Averaging Transfer Option, subject to the conditions described below.

Under this option, an amount specified by the owner will be automatically transferred out of the RS Money Market VIP Series and into the Fixed Rate Option or the variable investment option(s) elected by the owner on a monthly basis. The owner may choose to have monthly transfers made for durations of 12, 24, or 36 months. The period chosen may not continue beyond the retirement date.

The following conditions apply to the Dollar Cost Averaging Transfer Option:

- An owner may elect this option on the issue date only if the initial premium is at least:
  - $10,000 and the owner chooses to make monthly transfers for a 12 month period; or
  - $20,000 and the owner chooses to make monthly transfers for a 24 month or 36 month period.

- An owner may elect this option after the issue date only if the contract has a minimum accumulation value at the time the option is elected:
  - If the owner chooses to make monthly transfers for a 12 month period, the contract's accumulation value must be at least $10,000.
  - If the owner chooses to make monthly transfers for a 24 month or 36 month period, the contract's accumulation value must be at least $20,000.
- The minimum amount which may be transferred into the Fixed Rate Option and/or each variable investment option is $100.
- Money may not be transferred into more than three other variable investment options or two other variable investment options and the Fixed Rate Option at any time.

The transfer amount(s) selected by the owner multiplied by the duration selected may not exceed the accumulation value of the RS Money Market VIP Series at the time the option is exercised. Transfers will be made on each monthly anniversary, or on the next business day if such anniversary is on a weekend or holiday.

The Dollar Cost Averaging Transfer Option will terminate if:

- this contract is surrendered;
- the requested number of transfers has been made;
- the accumulation value in the RS Money Market VIP Series is insufficient to make a monthly transfer; or
- the Company receives proper written request from the owner to cancel the option. Such request must be received at the Company's Customer Service Office at least 3 business days before the next monthly anniversary in order to cancel the transfer scheduled to take effect on such anniversary.

After the issue date, in order to initiate or effect any change under the Dollar Cost Averaging Transfer Option, or to reinstate such option if it has terminated, the owner must properly complete an enrollment form and submit it to the Company's Customer Service Office. Such form must be received by the Company at least 3 business days before the monthly anniversary on which such first transfer will be made.

EXHIBIT 1

# 8. ACCUMULATION VALUE

**Accumulation Units**

An accumulation unit is a measurement used to determine the value of the owner's interest under this contract before annuity payments begin. The number of accumulation units purchased in each designated variable investment option or the Fixed Rate Option will be determined by multiplying (a) by (b), then dividing the result by (c), where:

- (a) is the net premium;
- (b) is the percentage to be allocated to the specified variable investment option or the Fixed Rate Option; and
- (c) is the value of an accumulation unit for the specified variable investment option or the Fixed Rate Option as of the valuation period during which the premium is received at the Company's Customer Service Office.

The value of each variable accumulation unit will depend on the investment experience of the variable investment options selected. Thus this value may increase or decrease and may vary from one valuation period to the next.

**Accumulation Unit Value for Account D and the RE Account**

The value of a variable accumulation unit for each subdivision of an investment division of Account D and for the RE Account was established at $10.00 as of the date operations began for that subdivision or for the RE Account. The accumulation unit value for any valuation period thereafter is (a) multiplied by (b), where:

- (a) is the variable accumulation unit value for the immediately preceding valuation period; and
- (b) is the net investment factor, as described below, for the current valuation period.

**Accumulation Unit Value for the Fixed Rate Option**

The value of accumulation units for the Fixed Rate Option was established at $10.00 as of the date operations began for that option. Thereafter, it will increase daily at a rate of interest to be determined from time to time by the Company, but which is guaranteed to be no less than 3.5% annually.

**Net Investment Factor**

The Company assesses a daily charge of .00003169 of the value of the assets allocated to each subdivision of the investment divisions of Account D and to the RE Account

for its assumption of mortality and expense risks. This mortality and expense charge is used in determining the net investment factor for each subdivision of investment divisions of Account D and for the RE Account. On an annual basis, the charge is equal to 1.15% of the value of the assets allocated to these variable investment options.

The net investment factor is used to calculate the value of an accumulation unit in any subdivision of an investment division of Account D or in the RE Account for a valuation period. The net investment factor is determined by dividing the sum of (a) and (b) by (c), and subtracting (d) from the result, where:

- (a) is the net asset value of a fund share held in Account D for the applicable subdivision of an investment division or any interest held in the RE Account, determined as of the end of the then current valuation period;
- (b) is the per share or per interest amount of any dividend and other distributions made by the fund or the RE Account during the current valuation period;
- (c) is the net asset value of the particular fund share or interest in the RE Account, determined as of the end of the immediately preceding valuation period;
- (d) is any applicable state premium taxes and the mortality and expense charge.

The net investment factor may be less than 1.00 since it is related to the investment experience of a separate account.

**Accumulation Value**

The value of all the accumulation units credited to this contract is the accumulation value. The accumulation value within any particular variable investment option or the Fixed Rate Option is determined by multiplying (a) by (b), where:

- (a) is the number of accumulation units credited to the contract for that particular variable investment option or the Fixed Rate Option; and
- (b) is the applicable current accumulation unit value.

This contract does not have any accumulation value after the retirement date.

# 9. SURRENDERS AND WITHDRAWALS

## Surrender of Contract

Before the retirement date and while the annuitant is living, the owner may surrender this contract for its then current accumulation value; the contract will then terminate. This contract must be sent to the Company's Customer Service Office for cancellation.

## Partial Withdrawals

Any partial withdrawals first will be taken from the investment divisions of Account D in proportion to each investment division's accumulation value on the date of the withdrawal. Partial withdrawals in excess of the amount taken from the investment divisions of Account D will then be withdrawn from the RE Account. Any remaining excess will be withdrawn from the Fixed Rate Option. Amounts withdrawn from any variable investment option or the Fixed Rate Option will be made in the same order in which such amounts were allocated to that variable investment option or the Fixed Rate Option.

The total accumulation value remaining after a partial withdrawal must be at least $1,000. If a partial withdrawal results in the total accumulation value falling below $1,000, then the balance will be paid to the owner and the contract will be canceled.

The following conditions apply for both partial withdrawals and surrenders:

- Written request satisfactory to the Company must be received at its Customer Service Office prior to any surrender or withdrawal.
- Any withdrawal payment or surrender will be reduced by any applicable state premium taxes and contingent deferred sales charges (as described below).
- The amount of any withdrawal payment will be determined as of the valuation date on or next following the date the Company receives the owner's proper written request for surrender or withdrawal.

## Contingent Deferred Sales Charges

A contingent deferred sales charge may be imposed on partial withdrawals or on the surrender of the contract.

## Contingent Deferred Sales Charges - Single Premium

If a single premium payment is made under this contract, the amount of the contingent deferred sales charge, if any, will be a percentage, as shown in the table below, of the amount withdrawn or surrendered:

| Contract Year | Percentage |
|---|---|
| 1 | 6% |
| 2 | 6% |
| 3 | 5% |
| 4 | 4% |
| 5 | 3% |
| 6 | 2% |
| 7 | 1% |
| 8 and later | 0% |

However, in any contract year after the first when a contingent deferred sales charge is applicable, the owner may make withdrawals, without incurring such a charge, of up to 10% of the greater of:

- the single premium paid; or
- the accumulation value as of the date of the first withdrawal in that contract year.

The maximum amount to which contingent deferred sales charges may be applied will not exceed the single premium payment.

## Contingent Deferred Sales Charges - Flexible Premiums

If flexible premium payments are made under this contract, the amount of any contingent deferred sales charge will be the lesser of:

- 6% of the total premiums paid in the 84 month period preceding the date of withdrawal or surrender; or
- 6% of the amount withdrawn or surrendered.

However, in any contract year after the first, the owner may make withdrawals, without incurring any contingent deferred sales charge, of up to 10% of the greater of:

- the amount of total premiums paid during the 84 months preceding the date of withdrawal; or
- the accumulation value as of the date of the first withdrawal in that contract year.

The maximum amount of contingent deferred sales charges applied during the 84 months immediately preceding the date of withdrawal will never exceed 6% of the total premiums paid during such period.

## Administration Fee

On each contract anniversary on or before the retirement date, the Company will deduct an administration fee of $35 from the accumulation value of this contract. This fee will be deducted from each subdivision of the investment divisions of Account D, from the RE Account, and from the Fixed Rate Option in proportion to the percentage of the accumulation value in Account D, the RE Account, and the Fixed Rate Option on that date. If this contract is surrendered on a date other than on a contract anniversary, the Company will deduct the administration fee on the date of surrender.

26

EXHIBIT 1

# 10. PAYMENT OF CONTRACT PROCEEDS

**Payment**

If the annuitant is living and this contract is in force on the retirement date, the Company will make monthly variable annuity payments under Variable Annuity Payout Option V-2, as stated in the "Annuity Benefit" provision or, if elected, one of the other annuity payout options. Payment of any annuity benefit or death benefit may be made under either a fixed or variable annuity payout option or a combination of both. If annuity payout option F-3 or V-3 is chosen, the owner, during the annuitant's lifetime (or beneficiary, if applicable) must also select a joint annuitant.

- The amount of the first annuity payment will be based on the table for the annuity payout option elected.
- The amount of any fixed annuity payments will not be less than the corresponding minimum amount based on the tables for the fixed annuity payout options, with interest compounded each year at 4%.
- The amount of any variable annuity payments after the first will increase or decrease according to the value of the variable annuity units, which reflect the investment experience of the variable investment option(s) elected. Any such payments will be based on an assumed investment return of 4% per year.
- All monthly annuity payments are based on:
  - the sex and age of the annuitant at the birthday nearest the date payments are to begin; and
  - the annuity payout option elected.

The annuity payout option tables are based on the 1983 Individual Annuity Mortality Table a projected under Scale G factors.

**Payees**

While the annuitant is living, the owner may name or change one or more beneficiaries who will be the payee or payees under an annuity payout option. After the annuitant dies, any person who is to receive payment in one sum (other than an assignee) can elect an option and name payees.

Only individuals who are to receive payments in their own behalf may be named as payees, unless the Company agrees to some other payee.

**Variable Annuity Payout Options Available**

**Option V-1 - Life Annuity without Guaranteed Period**
The Company will make monthly variable annuity payments for the lifetime of the annuitant. The amount of the first monthly payment will be based on the Option V-1 table.

**Option V-2 - Life Annuity with 10 Year Guaranteed Period**
The Company will make monthly variable annuity payments during the lifetime of the annuitant. The amount of the first monthly payment will be based on the Option V-2 table.

Payments are guaranteed for a period of 10 years. If the annuitant dies sooner, payment will be made during the remaining period to the beneficiary. The beneficiary may elect to be paid the commuted value of the current dollar amount of the then remaining number of variable annuity payments. If the beneficiary dies while receiving such payments, the commuted value of the current dollar amount of the remaining number of variable annuity payments will be paid in one sum to the beneficiary's estate.

**Option V-3 - Joint and Survivor Annuity**
The Company will make monthly variable annuity payments while the annuitant and the joint annuitant are living. When an annuitant dies, two-thirds of the number of annuity units in effect while both were living will continue for the lifetime of the survivor. The amount of the first variable annuity payment will be based on the Option V-3 table.

**Fixed Annuity Payout Options Available**

**Option F-1 - Life Annuity without Guaranteed Period**
The Company will make monthly fixed annuity payments for the lifetime of the annuitant.

**Option F-2 - Life Annuity with 10 Year Guaranteed Period**
The Company will make monthly fixed annuity payments during the lifetime of the annuitant. Payments are guaranteed for a period of 10 years. If the annuitant dies sooner, payments will be made during the remaining period to the beneficiary. The beneficiary may elect to be paid the present value of the current dollar amount of the then remaining number of fixed annuity payments. If the beneficiary dies while receiving such payments, the present value of the current dollar amount of the remaining number of fixed annuity payments will be paid in one sum to the beneficiary's estate.

**Option F-3 - Joint and Survivor Annuity**
The Company will make monthly fixed payments while the annuitant and the joint annuitant are living. When an annuitant dies, the Company will continue to pay, for the lifetime of the survivor, two-thirds of the amount of the payment in effect while both were living.

27

EXHIBIT 1
Page 12

210176527

# PAYMENT OF CONTRACT PROCEEDS - cont'd.

### Determination of First Annuity Payment

At the time annuity payments begin, the Company determines the accumulation value for each variable investment option and/or the Fixed Rate Option by multiplying (a) by (b), and deducting (c) from the result, where:

- (a) is the accumulation unit value on the valuation date 10 days before the date the first annuity payment is due;
- (b) is the number of accumulation units credited to the owner's account as of the date the first annuity payment is due; and
- (c) is any applicable state premium taxes not previously deducted.

The tables below indicate the dollar amount of the first monthly annuity payment which can be purchased with each $1,000 of accumulation value. The first annuity payment is determined by multiplying (a) by (b), where:

- (a) is the amount shown in the applicable table for the annuitant's age and sex; and
- (b) is the number of thousands of dollars of accumulation value.

The dollar amount of the first monthly annuity payment purchased for ages not shown in the tables are available upon request.

### Annuity Unit Values

For variable annuity payout options, the accumulation value of this contract will be applied to purchase annuity units. Annuity units are used to determine the amount of each variable annuity payment after the first.

The value of an annuity unit is determined independently for each subdivision of an investment division of Account D and for the RE Account. The dollar value of variable annuity units may increase or decrease depending upon the investment experience of the investment option(s) elected.

The value of an annuity unit in each subdivision of an investment division of Account D and in the RE Account was established at $1.00 on the date operations began for each such variable investment option. The value of an annuity unit at the end of any subsequent valuation period is equal to (a) multiplied by (b), where:

- (a) is the annuity unit value on the immediately preceding valuation period; and
- (b) is the annuity change factor for the current valuation period.

The annuity change factor is equal to the net investment factor (as described in the "Net Investment Factor" provision) for the same valuation period adjusted to recognize the assumed investment return of 4% per year used in determining the amounts of variable annuity payments.

The valuation of all assets in Account D and the RE Account will be determined in accordance with all applicable laws and regulations.

### Determination of Variable Annuity Payments After the First

The amounts of variable annuity payments made after the first is determined by multiplying (a) by (b), where:

- (a) is the number of annuity units in each subdivision of investment divisions of Account D and in the RE Account; and
- (b) is the appropriate annuity unit value as of the valuation date 10 days prior to the date the variable annuity payment is due.

The number of annuity units under this contract is determined by dividing (a) by (b), where:

- (a) is the amount of the first monthly variable annuity payment for each subdivision of investment divisions of Account D and for the RE Account; and
- (b) is the value of the appropriate annuity unit on the date the first variable annuity payment is made.

The number of annuity units remains fixed during the annuity payment period, provided no transfers among variable investment options are made.

The Company guarantees that the dollar amount of each variable annuity payment after the first will not be adversely affected by:

- the actual administration expenses it incurs; or
- variations in mortality experience from the mortality assumptions upon which the first payment is based.

### Annuity Payout Options: General Provisions

- At least $2,000 must be applied under an annuity payout option. Proceeds of a smaller amount will be paid in one sum.
- If monthly annuity payments are or become $20 or less, the Company reserves the right to change the frequency of payment.

IVA-2008

EXHIBIT 1

210176527